## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STEPHEN TURNER, ROCHELLE TURNER, and CINCINNATI INSURANCE CO., | ) ) ) ) | CASE NO. 8:06CV227 |
| Plaintiffs, | ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| MOEN STEEL ERECTION, INC., | ) ) | |
| Defendant, | ) ) | |
| v. | ) ) | |
| ENTERPRISE PRECAST CONCRETE, INC., AGA CONSULTING, INC., CITY OF OMAHA, and BERINGER, CIACCIO, DENNELL, MABREY, INC., A/K/A ZENON, BERINGER, MABREY PARTNERS, INC., | ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

The matter before the Court is the Third-Party Defendant Beringer, Ciaccio, Dennell, Mabrey, Inc.'s ("BCDM")[1] Motion for Summary Judgment. For the reasons stated below, the motion will be denied.

### Parties and Jurisdiction

The Plaintiff Stephen Turner ("Turner") was a concrete finisher who was injured when a 4,600-pound pre-cast concrete wall panel fell on him at the Omaha Park Eight Garage construction project (the "Project"). His employer, Lund-Ross Constructors, Inc. ("Lund"), was the general contractor for the Project. The Cincinnati Insurance Company

---

[1]During the contract negotiation phase of the construction project at issue in this case, BCDM was known as Zenon, Beringer, Mabrey Parterns, Inc. (Beringer, Ciaccio, Dennell, Mabrey, Inc.'s Answer to Amended Third-Party Complaint, Filing No. 143).

is the workers compensation carrier for Lund, and alleges to have paid workers compensation benefits to Turner.  It has been made a party to this action to determine its subrogation interests under Nebraska law.  (Complaint, Filing No. 1, ¶¶ 2, 5–6).

The Plaintiffs filed this action on February 21, 2006, invoking the Court's diversity jurisdiction.  (*Id.* ¶ 4).  The Plaintiffs have averred that the amount in controversy exceeds $75,000; that the Turners are residents of Iowa and the Cincinnati Insurance Company is incorporated in Ohio; and that the Defendant Moen Steel Erection, Inc. ("Moen"), a subcontractor providing steel work including erection of all pre-cast concrete panels for the Project, is incorporated and principally conducts business in Nebraska.  (*Id.* ¶¶ 1–4).

On March 24, 2006, Moen filed a Third-Party Complaint against Enterprise Precast Concrete, Inc. ("Enterprise"), a Nebraska corporation, alleging that Enterprise designed and manufactured the pre-cast concrete wall that fell on Turner and is consequently accountable to Moen for contribution for any damages for which Moen may be found liable.  (Third-Party Complaint, Filing No. 7, ¶¶ 8–15 ).  On October 23, 2006, Moen amended[2] its Third-Party Complaint to add claims against the City of Omaha, a political subdivision of Nebraska, as owner of the real property and the improvements; AGA Consulting, Inc. ("AGA"), a foreign corporation existing under the laws of Minnesota, as professional engineers consulting and supervising the Project; and BCDM, a Nebraska corporation, as

---

[2]Moen also sought leave to amend its Third-Party Complaint to assert a third-party claim against Lund, as general contractor of the Project and the employer of Turner.  (Motion to Amend Third-Party Complaint, Filing No. 60-1; proposed Amended Third-Party Complaint of Moen Steel Erection, Inc., Filing No. 60-2, ¶¶ 6, 49–56).  However, on September 13, 2006, Magistrate Judge Gossett denied Moen's motion as it related to Lund.  He found that Nebraska's worker compensation laws provided the exclusive remedy for an employee against an employer, and that Nebraska courts have refused to extend the employer's liability to allow suits brought by third parties.  (Memorandum and Order, Filing No. 106, pp. 4–8).

professional architects designing and supervising the Project. (Amended Third-Party Complaint, Filing No. 110, ¶¶ 4–6).

Although no party currently contests this Court's subject matter jurisdiction, I have conducted an independent review and find that this Court does have diversity jurisdiction under 28 U.S.C. § 1332(a). Further, I find that since Nebraska is the forum state and the state in which many of the events giving rise to the causes of action allegedly occurred, (Complaint, ¶¶ 5–7; Amended Third-Party Complaint, ¶ 10), this Court will apply the substantive law of the State of Nebraska. *See Heatherly v. Alexander*, 421 F.3d 638, 641 (8th Cir. 2005); *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997).

## Procedural History

As stated above, Moen filed a third-party action against BCDM, alleging that BCDM was negligent in its design and professional supervision of the Project, and that BCDM knew or should have known that the panel and connection referenced in the Plaintiffs' Complaint ("F23 panel") were defective and unreasonably dangerous. BCDM has filed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that the pleadings, exhibits, discovery, affidavits, and relevant case law show that there are no genuine issues of material fact, and that BCDM is entitled to judgment as a matter of law. (Motion for Summary Judgment, Filing No. 178, pp. 1–2). The local rules of this Court require that the party moving for summary judgment set forth a statement of facts consisting of short numbered paragraphs with pinpoint references to the record. *See* NECivR 56.1(a)(1)–(2). BCDM, in sections III and IV of its brief-in-support

(Brief-in-Support, Filing No. 180), includes a general narrative of the facts, with citations to the record throughout. (*Id.* at 4–15). Section V then sets out a statement of facts consisting of seven short numbered paragraphs, without pinpoint citations to the record. (*Id.* at 15–16). This is not substantial compliance with the local rule, and constitutes grounds for denial of the motion.

BCDM attempted to remedy this deficiency by filing, in its brief-in-reply (Reply Brief, Filing No. 186), a statement of facts that purportedly conformed to NECivR 56.1. (*Id.* at 2–4). However, I note that BCDM's second statement of material facts is, in and of itself, an insufficient recitation of the facts to support its summary judgment motion.[3] (*Id.* at 3–4 ¶¶ 1–6).

Moen filed a sur-reply brief (Sur-Reply Brief, Filing No. 194) that responded to the statement of material facts set out in BCDM's brief-in-reply, (*id.* at 2–5), and presented a thorough recitation of facts, in short numbered paragraphs with citation to the record, to support its claim of negligence against BCDM, (*id.* at 5–10).

---

[3]BCDM's brief-in-reply sets forth the following six material facts, supported with citations to the record:

1.   That BCDM did not design the connection for the pre-cast panels used at the project.
2.   The fabricator of the pre-cast panels specified the type of connection to be used by the installer.
3.   Moen departed from the installation specifications for the F23 panel.
4.   Moen did not obtain any advance authorization from the general contractor, architect or engineer to change the installation specifications for the F23 panel or alter the mode of installation.
5.   Moen has designated its experts in this case, but none of the experts is an`architect nor will any architects testify that BCDM's work fell below the applicable standard of care for architects in the Omaha, Douglas County, Nebraska area.
6.   The duty to conduct any special inspections was the responsibility of AGA Consulting, Inc.

(Sur-Reply Brief, pp. 3–4 ¶¶ 1–6).

4

## Standard of Review

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249–50 (citations omitted). Summary judgment is "properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327.

### Facts

This case concerns injuries allegedly sustained by Turner while he was working as a concrete finisher on a parking garage construction project owned by the City of Omaha. (Complaint, pp. 1–2). The City of Omaha hired BCDM to provide architectural services, and Lund to serve as general contractor. BCDM subsequently hired AGA to serve as engineering consultants, and Lund hired Moen as a subcontractor to provide steel work.

### A. Contract Between Architect and Owner

On June 6, 2001, the City of Omaha and BCDM entered into an agreement for BCDM to provide certain architectural services. (Contract between Zenon, Beringer, Mabrey Partners, Inc., and the City of Omaha ("Architect/Owner Contract"), Filing No. 179-4). Among those services, BCDM contracted to

> visit the site at intervals appropriate to the stage of construction . . . to become generally familiar with the progress and quality of the Work completed and to determine in general if the Work is being performed in a manner indicating that the Work when completed will be in accordance with the Contract Documents. However, [BCDM] shall not be required to make exhaustive or continuous on-site inspection to check the quality or quantity of the Work. On the basis of on-site observations as an architect, [BCDM] shall keep the [City of Omaha] informed of the progress and quality of the Work, and shall endeavor to guard the [City of Omaha] against defects and deficiencies in the work.

(*Id.* ¶ 2.6.5)). The Architect/Owner Contract further states that BCDM

> shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or

6

procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction. . . . [BCDM] shall at all times have access to the Work wherever it is in preparation or progress. . . . [BCDM] shall have authority to reject Work which does not conform to the Contract Documents. Whenever [BCDM] considers it necessary or advisable for implementation of the intent of the Contract Documents, [BCDM] will have authority to require additional inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of [BCDM] nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of [BCDM] to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons performing portions of the Work. . . . Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the [City of Omaha] or [BCDM].

(*Id.* ¶¶ 2.6.6, 2.6.7, 2.6.11, 9.7).

### B. Contract Between Architect and Engineering Consultants

On March 18, 2002, BCDM and AGA entered into a consulting agreement. (Contract between Zenon, Beringer, Mabrey Partners, Inc., and AGA Consulting, Inc. ("Architect/Consultant Contract"), Filing No. 179-5). The Architect/Consultant Contract states that AGA was to provide BCDM with engineering consulting professional services. Among the consultant's general responsibilities, the Architect/Consultant Contract provides that AGA

shall recommend to [BCDM] that appropriate investigations, surveys, tests, analyses and reports be obtained as necessary for the proper execution of [AGA's] services.

(*Id.* ¶ 3.1.3). Under the scope of the consultant's services, the Architect/Consultant Contract states that AGA

shall assist [BCDM] as necessary in connection with the Owner's responsibility for filing the documents concerning [the part of the

7

> Project for which the Consultant is to provide services] required for the approval of governmental authorities having jurisdiction over the Project.

(*Id.* ¶ 4.3.2). Under the architect's responsibilities, the Architect/Consultant Contract states that BCDM

> shall review [AGA's] work for compliance with the [City of Omaha's] program for overall coordination with the architectural and engineering requirements.

(*Id.* ¶ 6.12).

### C. Contract Between General Contractor and Subcontractor

On July 18, 2002, the City of Omaha and Lund entered into a construction agreement. (Contract between the City of Omaha and Lund-Ross Constructors, Inc. ("Owner/GC Contract"), Filing No. 179-2). Lund subsequently entered into a subcontract construction agreement with Moen. (Contract between Lund-Ross Constructors, Inc., and Moen Steel Erection ("GC/Sub Contract"), Filing No. 195-4). The GC/Sub Contract provides, in part, that Moen was to unload and erect structural steel, and to

> [u]nload and erect precast provided by others. It is noted that approximately 24 pcs. of precast will require placement using a crane provided by your firm. All the described work to be performed in strict accordance with the plans and specifications provided by the architect. . . . All communications from [Moen], written or oral, shall be directed to [Lund]. Direct communication with [BCDM or the City of Omaha] will not be permitted.

(*Id.* ¶¶ I, II.J).

### D. Undisputed and Disputed Facts

Moen's contractual duty included installation of the structural steel for the pre-cast concrete panels provided by Enterprise. Moen does not dispute that it departed from the

8

installation specifications for the F23 panel, but claims that any departure by Moen employees from the design specified "was because the design was impossible to construct as designed." (Reply Brief, p. 3 ¶ 3; Sur-Reply Brief, p. 3 ¶ 3). Further, Moen claims that Enterprise designed the concrete panels according to specified design criteria and structural details prepared by BCDM and AGA. (Sur-Reply Brief, p. 3 ¶ 2).

BCDM claims, and Moen does not deny, that Moen did not give BCDM notice of its installation-design departure. However, Moen claims that it was contractually obligated to communicate only with Lund (and it was Lund's duty thereafter to prepare a request for information for changes), and Moen had advised Lund's superintendent that it could not complete assembly of the pre-cast concrete panels as designed. (Reply Brief, p. 3 ¶ 4; Sur-Reply Brief, p. 4 ¶ 4).

Moen states that the Project, including the F23 panel, was required to be designed according to the 1994 Uniform Building Code ("Code"). The 1994 Code was published by the International Conference of Building Officials ("ICBO") and provided the building regulations for design and construction of the Project. Enterprise's design called for a Hilti Hit HY-150 adhesive anchoring system, an alternative type of anchoring system to that specified in the Code,[4] on its pre-cast shop drawings for the Project. The Code does not specifically address the use of the Hilti Hit HY-150 adhesive anchor system or the use of Hilti adhesive for anchoring pre-cast panels; however, the ICBO has evaluated the Hilti Hit HY-150 adhesive anchor system. An ICBO report, Report No. 5193 ("Report"), specified necessary conditions of use for the Hilti Hit HY-150 adhesive in order to comply with the

---

[4]Moen states that the Code, as adopted by the City of Omaha, specifies only the use of bolts and headed studs for anchors that are cast in concrete. (Sur-Reply Brief, p. 8 ¶ 14).

9

Code.  The Report was issued in 1995, and then reissued in 2002.  The 2002 reissued Report governed the Project's use of the Hilti Hit HY-150 adhesive system and compliance with the Code.  According to the reissued Report, a special inspection must be provided for all such anchor installations to comply with the Code.  A cross-referenced section of the Code requires that the special inspector record product description; adhesive expiration date; concrete or masonry type and strength; anchor diameter and steel grade; certain compliance of the drill bit; hole diameter and location; cleanliness of the hole and anchor; adhesive application; and anchor embedment.  Further, in a report to the building inspector, the special inspector is to state whether the anchor installation is in accordance with the manufacture's published instructions and the Code's evaluation report.  The Code provides that the special inspector shall be employed by the owner, the engineer, or the architect of record.  No special inspector was ever employed by the City of Omaha, AGA, or BCDM.  (Sur-Reply Brief, pp. 8–9 ¶¶ 11–22).

## Discussion

BCDM argues that (1) the evidence demonstrates that, pursuant to its contract with the City of Omaha, BCDM had no duty to control the means and methods of construction and no duty to ensure job-site safety; (2) Moen's failure to follow the installation specifications prescribed by BCDM (in breach of Moen's contract with Lund) was the proximate cause of any damage suffered by Turner; and (3) Moen has not designated an architectural expert witness to support its allegation that BCDM was negligent, precluding Moen from establishing professional negligence under Nebraska law.  Each of these arguments is discussed below.

### A. Duty

BCDM first argues that it had no duty to inspect the work site because, pursuant to its contract with the City of Omaha, BCDM was not required to make exhaustive or continuous onsite inspections, nor was BCDM in charge of or responsible for construction means, methods, techniques, procedures, or safety precautions in connection with the work performed on the Project. Alternatively, BCDM states that pursuant to its contract with AGA, BCDM delegated to AGA its responsibility to conduct any necessary special inspections. (Brief-in-Support, pp. 5–6; Brief-in-Reply, p. 4). Moen argues that BCDM had a duty by law to identify the Code requirement for a special inspection of the F23 connection panel, and to employ qualified inspectors to inspect the connections for the F23 panel to ensure that it was assembled in conformance with the Code.

The Nebraska Supreme Court, in *Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd.*, 506 N.W.2d 706 (Neb. 1993), dealt with an issue similar to the one currently before this Court. In that case, the owner of a construction project brought suit against a builder to recover damages from alleged defects in the construction. The builder filed a third-party complaint against the architect for the project, asserting that the architect had a contractual duty to report deviations from the buildings plans. The architect denied any such duty, arguing that under its contract it did not have control and was not responsible for construction means, and therefore was not liable for construction deficiencies. Discussing similar contract language, that BCDM now argues discharged it from a duty to inspect,[5] the Nebraska Supreme Court determined that "'the language said to be

---

[5]The Nebraska Supreme Court noted the following contract language:
The Architect shall not have control or charge of and shall not be

exculpatory constitutes nothing other than an agreement that the architect is not the insurer or guarantor of the general contractor's obligation to carry out the work in accordance with the contract documents. . . .' However, such language does not absolve the architect from liability for a breach of the architect's contractual duty, if one exists, to inform the owner of deviations from the building plans when the architect has agreed to make periodic observations. The continuing question, then, is whether or not [the architect] had a duty to report deviations from the architect's plans." *Id.* at 710 (quoting *Hunt v. Ellisor & Tanner, Inc.*, 739 N.W.2d 933, 937 (Tex. Civ. App. 1987)).

Similarly, I find that, for purposes of this motion, such language does not absolve BCDM from liability for a breach of the architect's legal duty, if one exists, to employ special inspectors. Moen has presented evidence that, when a Hilti Hit HY-150 adhesive anchoring system is used, the Code imposes a duty on the owner, the engineer, or the architect of record to hire a special inspector. BCDM argues that, if it had any such duty to hire a special inspector, that duty was delegated to AGA. It is true that AGA was charged with assisting BCDM "as necessary in connection with the Owner's responsibility for filing the documents concerning" the Project's "approval of governmental authorities having jurisdiction over the Project." However, pursuant to the Architect/Consultant Contract, BCDM retained some duty with regard to the Project's overall compliance with the Code. Specifically, I note that the Architect/Consultant Contract states that BCDM "shall review [AGA's] work for compliance with the [City of Omaha's] program for overall

responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work . . . .

*Gables CVF*, 506 N.W.2d at 710.

12

coordination with the architectural and engineering requirements." While I need not now determine the extent of BCDM's contractual duty, I find that under the Architect/Consultant Contract, BCDM remained responsible for ascertaining whether AGA's work complied with Code, which included ensuring that any required special inspector visited the Project site.

## B. Proximate Cause

BCDM states that, pursuant to Moen's contract with Lund, Moen was to perform its work in erection of the steel, welding, and bolting in strict accordance with the plans and specifications provided by BCDM, (Brief-in-Support, p. 6), and that the uncontroverted facts show that "Moen did not follow the Enterprise shop drawing specifications prescribed for installation and did not obtain any approval from the contractor, engineer or manufacturer to make a change in the panel connection such as it did," (*id.* at 22). Moen, on the other hand, states that BCDM never confirmed that the F23 connection panel was assembled in conformance with the applicable building codes, and BCDM never employed qualified persons to inspect the F23 connection panel. Moen argues that BCDM's failure to employ qualified inspectors to inspect the F23 connection panel was a proximate cause of Turner's injury. (Brief-in-Opposition, p. 12).

Under Nebraska law, it is generally true that the question of proximate cause is one for the finder of fact. *T.O. Haas Tire Co. v. Futura Coatings, Inc.*, 507 N.W.2d 297, 303 (Neb. App. 1993). The facts of this case do not support a finding otherwise. Two plausible alternative theories of causation are offered—(1) the failure of BCDM to employ a special inspector; and (2) the failure of Moen strictly to follow the architect's design—and it is possible for a jury to find that one, both, or neither was the proximate cause of the

13

accident.  Because there are questions of material fact remaining as to the proximate cause of the accident, I will not grant summary judgment on the issue of proximate cause.

### C. Expert Testimony

BCDM states that Moen has not designated an architectural expert witness to support its allegation that BCDM was negligent which, BCDM argues, is fatal to Moen's claim of professional negligence under Nebraska law.  (Brief-in-Support, p. 16).  Moen, on the other hand, argues that BCDM's negligence (*i.e.*, failure to follow the standard set forth under the Code that requires the architect, engineer, or owner to hire a special inspector) is not beyond a lay juror's comprehension, and consequently lies within an exception to the general rule requiring expert testimony to establish a reasonable standard of professional care—that when presented with commonplace factual situations that the ordinary jury layperson can readily grasp and understand, expert testimony is not needed.  Further, Moen argues that to the extent understanding of the Code requires explanation by a professional, Moen's designated *engineering* expert—Dr. George Wandling—is qualified to provide such an explanation.  (Sur-Reply Brief, p. 11).

Under Nebraska law, in a malpractice action involving professional negligence, the burden is on the plaintiff to show (1) the generally recognized standard of care; (2) a deviation from that standard by the defendant; and (3) that the deviation was the proximate cause of the plaintiff's alleged injuries.  *Neill v. Hemphill*, 607 N.W.2d 500, 503 (Neb. 2000) (citing *McLaughlin v. Hellbusch*, 591 N.W.2d 569 (Neb. 1999); *Doe v. Zedek*, 587 N.W.2d 885 (Neb. 1999)).  Usually, this burden can only be satisfied through expert testimony. *See Boyle v. Welsh*, 578 N.W.2d 496, 500 (Neb. App. 1998) ("Generally, in professional

14

negligence cases, the issue of whether a specific professional act or service demonstrates a lack of skill or knowledge or failure to exercise reasonable care is a matter that must be proved by expert testimony.") (citing *Vilcinskas v. Johnson*, 562 N.W.2d 57 (Neb. 1997); *Overland Constructors v. Millard School Dist.*, 369 N.W.2d 69 (Neb. 1985)), *rev'd on other grounds*, 589 N.W.2d 118 (Neb. 1999).  It is the trial court's responsibility to determine if there is sufficient foundation for a witness to qualify as an expert in a given area.  *Hoffart v. Hodge*, 609 N.W.2d 397, 406 (Neb. App. 2000).  "Whether one qualifies as an expert depends on the factual basis or the reality underlying the witness' claim to expertise rather than upon a title. . . . [E]xperts or skilled witnesses will be considered qualified if, and only if, they possess special skill or knowledge respecting the subject matter involved so superior to that of persons in general as to make the expert's formation of a judgment a fact of probative value."  *Id* at 406–07.  *See also Nat'l Cash Register Co. v. Haak*, 335 A.2d 407, 411 (Pa. 1975) ("This is certainly a subject that 'requires special experience.' However, there is nothing inherent in the nature of that experience that makes it unique to architects. What the jury needed was not 'the assistance of one who possesses a knowledge' of architecture but of surface water disposal systems. Whether the person offering that assistance happened to be an architect, or engineer, or geologist, or something else, was unimportant; what was important was what he knew.").

I note that the Code sections cited by Moen charge the owner, engineer, or architect of record with an identical duty.  I agree with Moen that there is "nothing about the architectural field which makes a professional architect uniquely qualified to evaluate expressly stated duties for Code required special inspections or the subsequent

15

employment of qualified personnel to discharge that Code imposed duty." (Sur-Reply Brief, p. 11).  For purposes of this motion, I find that because of his specialized knowledge of the Code, Dr. Wandling would be competent to offer an opinion as to whether an *engineer* failed to follow the Code and whether such failure was a proximate cause of injury; similarly, he is also competent to serve as an expert witness to support Moen's claim that BCDM failed to employ a special inspector.[6]

Moen states that its "principal allegation of negligence against BCDM concerns its failure to adhere to an applicable building code, adopted by the City of Omaha as law of the local jurisdiction." (*Id.* at 4 ¶ 5).  Moen has sufficiently demonstrated a genuine issue of material fact as to the existence of BCDM's duty, and as to whether BCDM's breach of that duty (if any) was a proximate cause of Turner's injury.  Accordingly,

IT IS ORDERED: The Third Party Defendant Beringer, Ciaccio, Dennell, Mabrey, Inc.'s Motion for Summary Judgment (Filing No. 178) is denied.

DATED this 5th day of June, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

---

[6]Consequently, I will not at this time decide Moen's argument that it does not need an expert witness because BCDM's alleged negligent act is within the cognisance of ordinary lay jurors.